# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES STOKES, | : |
| | : C.A. No.   1:19-cv-02014 LPS |
| PLAINTIFF, | : |
| | : |
| v. | : TRIAL BY JURY OF TWELVE |
| | : DEMANDED |
| MARKEL AMERICAN INSURANCE | : |
| COMPANY, a foreign corporation, | : |
| | : |
| DEFENDANT. | : |

**DEFENDANT MARKEL AMERICAN INSURANCE COMPANY'S
CONCISE STATEMENT OF UNDISPUTED FACTS[1]**

1.　　Markel American Insurance Company ("MAIC") was and still is an insurance company organized and existing under the laws of Virginia, having its principal place of business in Glen Allen, Virginia.[2]

2.　　On October 20, 2016, MAIC issued Policy No. MHP00000361698 (the "Policy") to Plaintiff for a 39-foot 2017 Midnight Express OPEN 1881 HP (the "Vessel"), bearing HIN #EXK395141617.[3]

3.　　Under the Policy, MAIC agreed, subject to various terms and conditions, to cover Plaintiff for loss or damage to the Vessel.[4]

4.　　Plaintiff's Watercraft Insurance Application listed his address as being in the District of Columbia.[5]  Further, Plaintiff's primary address was listed as the District of Columbia

---

[1] Exhibit numbers correspond with those in MAIC's Opening Brief in Support if its Motion for Summary Judgment.
[2] *See generally* Exhibit 6- Certified Policy ("Policy").
[3] Exhibit 1 - Complaint, ¶ 2, 6; Exhibit 2- MAIC's Confidential Production (MAIC Prod.), at MARKEL 000307 (MAIC Underwriting File -Policy's Watercraft Declarations Page for the period of October 20, 2017 to October 20, 2018) ("Declarations Page").
[4] *See generally* Exhibit 6 - Policy.
[5] Exhibit 2- MAIC Prod., at MARKEL 000334 (Plaintiff's Watercraft Insurance Application to MAIC) ("Application").

27322578v.1

in the Policy Declarations.[6] Thus, the Policy was issued and delivered to Plaintiff in the District of Columbia.[7] Plaintiff also admitted that "his primary residence and principal place of business [are] in District of Columbia," and he "is not a Florida resident."[8]

5.  Plaintiff, of his own volition, negotiated the Policy with an insurance agent, reviewed and signed the application, executed the Policy documents, and renewed the Policy three times in 2017, 2018, and 2019 (after the loss).[9]

6.  The Policy includes the following express warranty: "It is warranted that the **insured watercraft** is seaworthy at the inception of this insuring agreement. Violation of this warranty voids this insuring agreement from its inception."[10]

7.  The Policy includes the following clause: "**We will cover sudden accidental direct physical loss or damage to the insured watercraft.**"[11] The term "'[A]ccidental' is synonymous with 'fortuitous.'"[12]

8.  The Policy includes the following exclusion: "We will not pay for loss, damage or expense caused by or resulting from: 9) **manufacturer's defects** or **design defects**."[13] As defined in the Policy, a design defect is "a flaw in the structural plan of the **insured watercraft's** hull or machinery, or any of its components."[14]

---

[6] *See* Exhibit 2 - MAIC Prod., at MARKEL 000307 (Declarations Page).
[7] *See generally* Exhibit 2- Underwriting File, at Markel 000251-000336.
[8] *Stokes v. Markel Am. Ins. Co.*, 2019 U.S. Dist. LEXIS 108685 (S.D. Fla. June 28, 2019)(granting MAIC's Motion to Dismiss for Improper Venue)("Order").
[9] Exhibit 2- MAIC Underwriting file at MARKEL 000251-336.
[10] Exhibit 6 - Policy, at page 1.
[11] Exhibit 6 –Policy, at page 5 (emphasis added).
[12] *Markel Am. Ins. Co. v. Pajam Fishing Corp.*, 691 F. Supp. 2d 260, 265 (D. Mass. 2010); *Great Lakes Ins. Se v. Wave Cruiser LLC*, 2020 U.S. Dist. LEXIS 207827, at *13 (S.D. Fla. Nov. 5, 2020)("'accident or 'accidental' is synonymous with 'fortuitous.'"); *see St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1202 (1st Cir. 1994) ("The courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen.").
[13] Exhibit 6 –Policy, at page  (emphasis in original).
[14] Exhibit 6 - Policy, at page  (emphasis in original).

9. On October 11, 2018, the Vessel sank during a rain event while moored at her berth in Ocean View, Delaware.[15]

10. On or around October 12, 2018, Plaintiff filed a claim under the Policy, which was assigned Claim No. 18C4603.[16]

11. On October 14, 2018, Mr. Jonathan Klopman inspected the Plaintiff's Vessel for the purpose of drafting a Damage Survey for MAIC.[17]

12. On November 12, 2018, MAIC issued a Reservation of Rights letter to Plaintiff, stating, *inter alia*, that 1) the Vessel may be unseaworthy, and 2) claim coverage may be subject to policy exclusions.[18]

13. On December 28, 2018, Plaintiff filed the instant matter in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.[19]

14. On January 30, 2019, MAIC removed the matter to the United States District Court for the Southern District of Florida.[20]

15. On June 28, 2019, Judge Altonaga of the United States District Court for the Southern District of Florida ordered that the case be transferred to the District of Delaware pursuant to 28 U.S.C. §1404(a), and that Florida's choice-of law rules would apply.[21]

16. On March 19, 2021, MAIC filed a Motion for Choice of Law, which is currently pending.[22]

---

[15] Exhibit 1- Complaint, ¶ 7; Exhibit 3 - MAIC Prod., at MARKEL 000087-107 (Klopman Damage Survey).
[16] Exhibit 1- Complaint, ¶ 9.
[17] Exhibit 3 - MAIC Prod., at MARKEL 000350-370 (Klopman Damage Survey).
[18] Exhibit 4- MAIC Prod., at MARKEL 000073-76 (Reservation of Rights letter); Exhibit 3- MAIC Prod., at MARKEL 000087-107 (Klopman Damage Survey).
[19] Exhibit 1- Complaint.
[20] Exhibit 5- MAIC Prod., at MARKEL 000113-119 (Defendant's Notice of Removal).
[21] Order, at page 9.
[22] *See generally* MAIC's Opening Brief in Support of its Motion for Choice of Law (D.I. 87).

17. Plaintiff's Expert, Charles Stephens, and Defense Expert, Robert Taylor, inspected the Vessel and drafted reports of their findings and conclusions.[23]

18. Mr. Taylor opined that the proximate cause of the loss was:

> a combination of (a) an un-gasketed bilge hatch located in the aft portion of the cockpit; (b) placement of the cockpit drainage scuppers directly adjacent to the aforementioned un-gasketed bilge hatch; and (c) the high static waterline relative to the elevation of the cockpit scuppers (the static waterline was essentially the same level as the scupper drains)."[24]

19. Mr. Stephens' report does not dispute, or address, Mr. Taylor's opinion on proximate cause, instead summarizing a list of possible "contributing factors."[25]

20. The Vessel was not built in compliance with the guidelines set forth by the American Boat and Yacht Council ("ABYC") or International Organization for Standardization ("ISO"), and Midnight Express was not certified by the National Marine Manufacturers Association ("NMMA") when it built the Vessel.[26]

21. The Vessel's drainage system did not meet all of the ABYC H-4 Standard to qualify as an assisted bailing system.[27]

22. The Vessel fails to meet the criteria laid out within the ABYC H-4 Standard for any of the six listed drainage system options."[28]

23. Wind did not play a significant part in causing this loss, and the Vessel was docked in calm waters at a slip surrounded by nearby condos at the time it sank.[29]

---

[23] *See generally* Exhibit 7 - Charles Stephens Report ("Stephens Report'); *See generally* Exhibit 8- Robert Taylor Report ("Taylor Report"), and *See generally* Exhibit 3 - MAIC Prod., at MARKEL 000350-370 (Klopman Damage Survey).
[24] Exhibit 8- Taylor Report, at ¶ 10(b).
[25] Exhibit 7-Stephens Report, at page 2.
[26] Exhibit 9- Deposition of Robert Taylor ("Taylor Dep."), at 17:15-21.3.
[27] Exhibit 9- Taylor Dep., at 100:25-111:7.
[28] Exhibit 9- Taylor Dep., at 202:9-203:5; Taylor Report, at pages 13-14.
[29] Exhibit 9- Taylor Dep., at 89:3-92:22; Exhibit 10- Deposition of James Stokes, at 43:12-20, 44:20-24, 45:14-46:24, at Exs. 5 and 6; Exhibit 11- Deposition of Jonathon K. Klopman ("Klopman Dep."), at 68:22-69:16.

24.     The Vessel was the only boat in the marina that suffered such a degree of loss during Hurricane Michael.[30]

25.     Mr. Stephens' report agrees with Mr. Taylor's description and statements related to the amount of rainfall at the time of the loss.[31]

26.     Mr. Stephens' report does not dispute, or address, Mr. Taylor's opinions that 1) the Vessel was not built to ABYC or ISO guidelines, and the manufacturer was not NMMA certified,[32] and 2) had the boat design met minimum industry performance requirements for cockpit drainage, it would not have sunk and the bilge pumps would have been able to handle the water that seeped into the Vessel's bilge.[33]

**WHITE AND WILLIAMS LLP**

*/s/ Daryll Hawthorne-Searight*
**TIMOTHY S. MARTIN (#4578)**
**DARYLL HAWTHORNE-SEARIGHT (#6520)**
Courthouse Square
600 N. King Street, Suite 800
Wilmington, DE 19801
(302) 467- 4520
Martint@whiteandwilliams.com
Counsel for Defendant,
*Markel American Insurance Company*

Dated: July 30, 2021

---

[30] Exhibit 11- Klopman Dep., at 128:25-129:2.
[31] Exhibit 7- Stephens Report, at page 2.
[32] Exhibit 8- Taylor Report, at ¶¶ 7 and 9; *see generally* Exhibit 7- Stephens Report.
[33] Exhibit 8- Taylor Report, at ¶¶ 7 and 9.

-5-

27322578v.1