# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAMES STOKES, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 19-2014-LPS |
| | : | |
| MARKEL AMERICAN INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Michael B. McCauley, PALMER, BIEZUP & HENDERSON LLP, Wilmington, Delaware

Daniel H. Wooster, PALMER, BIEZUP & HENDERSON LLP, Philadelphia, Pennsylvania

David A. Neblett, James M. Mahaffey III, and John A. Wynn, PERRY & NEBLETT, P.A., Miami, Florida

     Attorneys for Plaintiff

Timothy S. Martin and Daryll Hawthorne-Searight, WHITE & WILLIAMS LLP, Wilmington, Delaware

Krista Fowler Acuna, HAMILTON, MILLER & BIRTHISEL LLP, Miami, Florida

     Attorneys for Defendant

---

## <u>MEMORANDUM OPINION</u>

March 31, 2022
Wilmington, Delaware



**STARK, U.S. Circuit Judge:**

On December 28, 2018, Plaintiff James Stokes ("Stokes" or "Plaintiff") filed suit against Markel American Insurance Company ("MAIC" or "Defendant") in Florida state court, asserting eight causes of action including breach of contract and tort claims. (D.I. 1-1) MAIC removed the case based on diversity jurisdiction to the United States District Court for the Southern District of Florida, and that court subsequently granted MAIC's motion to transfer the case to this Court pursuant to 28 U.S.C. § 1404(a). (*See* D.I. 87 Ex. 2)

Presently before the Court are MAIC's motion for choice of law (D.I. 86), Plaintiff's *Daubert* motion (D.I. 98), and summary judgment motions brought by both MAIC (D.I. 104) and Plaintiff (D.I. 107). On January 6, 2022, the Court heard argument on all four motions. (D.I. 120) ("Tr.")

Having considered the parties' arguments and filings, and for the reasons below, the Court will deny Plaintiff's *Daubert* motion; grant in part and deny in part Defendant's summary judgment motion; and deny Plaintiff's summary judgment motion. The Court agrees with Defendant's analysis as to which substantive law governs Plaintiff's various claims, and has applied the law accordingly in deciding the parties' dispositive motions.

## I.     BACKGROUND[1]

On October 11, 2018, during heavy rains brought by Hurricane Michael, Plaintiff's boat sank while it was moored in Ocean View, Delaware. (*See* D.I. 108 at 2; *id.* Ex. E at 1) The 2017

---

[1] Plaintiff notes that MAIC filed a five-page statement of facts separate from its brief in support of its motion for summary judgment, without seeking leave for an extension of the twenty-page limit for dispositive motions. (*See* D.I. 114 at 2 n.4) Defendant explains it filed the "separate exhibit because it believes it to be customary in federal court." (D.I. 115 at 1 n.2) The Court will disregard the extra pages but will not, as Plaintiff requests, deny the motion "on the basis of this violation alone." (D.I. 114 at 2 n.4)

39-foot Midnight Express (the "Vessel") was insured by MAIC, under Policy No.

MHP00000361698 (the "Policy"), an "all-risk," agreed $680,000 value, marine policy covering

the period between October 20, 2017 and October 20, 2018.  (D.I. 108 Ex. B)  The Policy's

choice-of-law provision provides:

> This policy is subject to established principles and precedents of
> federal admiralty law of the United States of America, but where
> no substantive principle or precedent is applicable state law shall
> apply.  Any provision of this policy that conflicts with applicable
> law or regulation is hereby amended to conform to the minimum
> requirements of the law or regulation.

(*Id.* at 3)

In terms of coverage, the Policy states: "We will cover sudden accidental direct physical

loss or damage to the insured watercraft." (*Id.* at 5) (emphasis omitted)  The Policy includes

several exclusions, one of which provides: "We will not pay for loss, damage or expense caused

by or resulting from . . . manufacturer's defects or design defects." (*Id.* at 6) (emphasis omitted)

A design defect is defined in the Policy as "a flaw in the structural plan of the insured

watercraft's hull or machinery, or any of its components." (*Id.* at 1) (emphasis omitted)  The

Policy provides further that: "It is warranted that the insured watercraft is seaworthy at the

inception of this insuring agreement.  Violation of this warranty voids this insuring agreement

from its inception." (*Id.*) (emphasis omitted)

On June 1, 2018, before the Vessel sank, Stokes negotiated and accepted the terms of an

Endorsed Policy that allowed the Vessel to remain in Florida for two weeks past the contractual

period. (*See* D.I. 95 at 14; D.I. 87 Ex. 4)  He also added the Rickenbacker Marina in Florida as

an additional insured to the Policy. (D.I. 87 Ex. 4)  Stokes claims that he negotiated and

accepted these terms while he was in Florida. (*See* D.I. 95 at 5-6)

After the Vessel sank, Plaintiff filed a claim under the Policy, and MAIC performed an initial survey of the Vessel. (*See* D.I. 108 at 3)  MAIC's surveyor, Jonathan Klopman, reported that "[a] thunderstorm passed through the marina between 11:00 PM and midnight.  The total rainfall for this time period was 7.29 inches.  This is an extreme amount of rainfall by any measure." (D.I. 108 Ex. E at 4)  After the initial survey, MAIC issued a reservation of rights letter on November 12, 2018, stating that the Vessel may be unseaworthy and that any claim for coverage may be subject to policy exclusions.  (D.I. 108 Ex. F at 2-3)  The letter also stated that MAIC could not yet determine whether coverage existed for Stokes' loss.  (*Id.*)  Although it has now been over three years since the loss, Plaintiff alleges that MAIC has not yet formulated an official coverage position.  (*See* D.I. 108 at 4)

Despite this uncertainty as to coverage, MAIC has paid costs related to the loss.  It issued invoices related to the post-loss work and storage of the Vessel totaling at least $5,280.25, and it paid more than $15,199.00 for raising, salvaging, and towing the Vessel from the site of the loss to the Indian River Marina, where the Vessel remains today.  (D.I. 108 at 6; *id.* Exs. E & H)  MAIC has also paid indemnity payments related to the loss on behalf of Stokes.  (*See* D.I. 108 at 6)

The parties' experts disagree as to why the Vessel sank.  In the view of Plaintiff's experts, the sinking was caused by an "excessive amount of rain from Hurricane Michael." (D.I. 114 Ex. A at 1)  By contrast, Defendant's expert, Robert K. Taylor, concluded that the Vessel was "defectively designed" because "the boat did not have an adequately designed cockpit drainage system" and "the deck hatch located directly adjacent to the cockpit scuppers was neither watertight nor weathertight." (D.I. 99 Ex. A at 17)  Alternatively, he opined that the lack

3

of an owner's manual or signage instructing users of these inadequacies or recommending that they cover the boat when not in use constituted design defects. (*Id.*)

Plaintiff alleges that the Vessel was only in Delaware because MAIC required that he store it there during hurricane season. (D.I. 36 Ex. 1 ¶ 18)  He claims that he purchased and registered the Vessel in Florida, "specifically for boating in Florida," and that his captain is located in Florida. (*Id.* ¶¶ 13-14)  At the time the parties entered into the Policy, however, Stokes' insurance agent was located in Maryland. (*See* D.I. 87 at 5)  His application for insurance for the Vessel lists his primary residence as being in the District of Columbia, where the Policy was issued and delivered to him. (*Id.*)  Stokes also lists a D.C. address as his primary address in the Policy Declarations, which state that the Vessel's "Unit Mooring Location" is in Maryland. (D.I. 87 Ex. 3 at 307)

## II.    LEGAL STANDARDS

### A.    *Daubert* Motions to Exclude

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Rule 702(a) requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue."  Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d).

There are three distinct requirements for proper expert testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

**B.    Summary Judgment**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 585 n.10 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks and emphasis omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating

party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted), *abrogated on other grounds by Rotkiske v. Klemm*, 890 F.3d 422 (3d Cir. 2018). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. To defeat the motion, "there must be evidence on which the jury could reasonably find" for the nonmoving party. *Id.*

## III.   DISCUSSION

### A.   Defendant's Choice-of-Law Motion

The parties disagree about which law governs Plaintiff's various claims. Defendant argues the Court should apply either federal admiralty law or the substantive law of the District of Columbia, depending on the nature of the claim. Plaintiff appears to agree that federal admiralty law applies to some of his claims but contends that Florida substantive law governs all of the others.

6

When federal jurisdiction is based on diversity of citizenship, the Court applies the forum

state's choice-of-law rules. *See Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 621 (3d Cir.

2009). Where, as here, a civil case has been transferred from one district court to another

pursuant to § 1404(a), the transferee court applies the law of the transferor state, including its

choice-of-law rules, as if there had been no change of venue. *See Van Dusen v. Barrack*, 376

U.S. 612, 639 (1964) ("A change of venue under § 1404(a) generally should be, with respect to

state law, but a change of courtrooms."); *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007). In

granting Defendant's motion to transfer this case, Judge Altonaga affirmed this principle, stating

that "Florida's choice-of-law rules will apply to the action regardless of the final forum." (D.I.

87 Ex. 2 at 9) While the Court is not bound by Judge Altonaga's determination, it agrees that

Florida's choice-of-law rules apply in determining which law governs Plaintiff's various claims.

### 1. Plaintiff's Breach of Contract Claim

The parties agree that the Policy is a marine insurance contract that includes a

presumptively valid, clear, and unambiguous choice-of-law provision. (*See* Tr. at 5-6, 15-17, 19,

26-27, 31) That provision contemplates two scenarios a court may face when interpreting the

Policy: (i) one in which established principles and precedents of federal admiralty law apply, and

(ii) one in which no substantive federal admiralty principle or precedent applies. (D.I. 108 Ex. B

at 3)

The parties appear to agree that, where the Court faces the *first* scenario, federal

admiralty substantive law applies. (*See* D.I. 87 at 7-12; Tr. at 21, 22-23, 26-27) Although

Plaintiff's position on this point was not entirely clear from the briefing, Plaintiff clarified at the

hearing that "admiralty law is going to apply on any established principles." (Tr. at 23; *see also*

*id.* at 17 ("[T]here [are] two types of law that will be applied: [a]dmiralty law, for those issues in

7

which admiralty law speaks . . . and the state law."); *id.* at 21 ("[A]dmiralty law, if [there is] an established principle, should be applied.")) Considering the consensus on this issue, and given that the Policy's choice-of-law provision is presumptively valid under Florida's choice-of-law rules, *see Se. Floating Docks, Inc. v. Auto-Owners Ins. Co.*, 82 So. 3d 73, 80 (Fla. 2012), the Court concludes that federal admiralty law governs the Policy where established principles and precedents of federal admiralty law exist.

Where the Court faces the ***second*** scenario, the parties' views diverge. To determine the substantive state law that applies in the absence of an established principle or precedent of federal admiralty law, Defendant advocates for Florida's choice-of-law rules (*see* D.I. 87 at 8), while Plaintiff contends that – because the Policy is a maritime contract – the Court should apply federal admiralty choice-of-law rules (*see* Tr. at 19, 34-35). The Court concludes that under either of these approaches, Florida law does ***not*** govern.

Florida courts apply the *lex loci contractus* rule, which, "as applied to insurance contracts, provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). Determining where a contract was executed is fact-intensive and turns on where the "last act necessary to complete the contract" occurred. *Pierce v. Prop. & Cas. Ins. Co. of Hartford*, 303 F. Supp. 3d 1302, 1305 (M.D. Fla. 2017). Courts have held that an offeree's communication of acceptance to the offeror can constitute the "last act necessary." *See Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004).

MAIC asserts that Plaintiff purchased and executed the Policy in the District of Columbia on October 18, 2016. (D.I. 87 at 13) (citing *id.* Ex. 3 at 334-36) Plaintiff's initial application

lists a primary phone number with a D.C. area code and address – to which the Policy and all renewal documents were sent.  (*Id.*) (citing *id.* Ex. 3 at 282, 321, 326-28)  Plaintiff responds that on June 1, 2018, while he was allegedly in Florida, he negotiated and accepted the terms of an Endorsed Policy that allowed the Vessel to remain in Florida for two weeks past the contractual period.  (D.I. 95 at 14; D.I. 87 Ex. 4)

Plaintiff, however, cites no authority for the notion that an endorsement amending certain provisions of a contract can constitute a "last act necessary" under Florida law.  Such a conclusion would conflict with the principles underlying the *lex loci contractus* rule, which recognizes that, absent some contrary provision, the parties entering into a contract bargain for the laws of the jurisdiction in which the contract was entered to control.  *See Roach*, 945 So.2d at 1164.  Further, to the extent Plaintiff argues the Endorsed Policy is separate from the Policy or that it alters the fundamental nature of the Policy (such that the parties contemplated a new bargain), the Court disagrees.

Nor is the Court persuaded that it should view Rickenbacker Marina (which Stokes included as an additional ensured under the Endorsed Policy) as an address in Florida to which MAIC could have delivered the Policy.  (*See* Tr. at 16, 21, 35; D.I. 87 Ex. 4 at 18)  There is no evidence in the record that Stokes advised MAIC he had changed his residency or requested that Policy-related documents could be sent to him at a specific Florida address.  (*See* Tr. at 7-8, 30)  Instead, Stokes admitted that he is "not a Florida resident" and that his primary residence and principal place of business are in the District of Columbia.[2]  (*See* D.I. 87 Ex. 2 at 10)

---

[2] For the same reasons, Plaintiff's alleged ownership at some point of property in Florida does not alter the *lex loci contractus* analysis.  (*See* Tr. at 10, 16; D.I. 87 Ex. 2 at 10)

The Court concludes that the "last act necessary to complete the contract" occurred in the District of Columbia, where the Policy was both executed and delivered to Stokes. Accordingly, the substantive law of the District of Columbia applies in the absence of an established principle or precedent of federal admiralty law.[3]

Application of federal admiralty choice-of-law rules would also not yield the result Plaintiff seeks. The choice-of-law analysis in maritime contract cases considers "which state has the most significant relationship with the transaction at issue." *Cont'l Cas. Co. v. Reese*, 2006 U.S. Dist. LEXIS 48035, at *10 (M.D. Fla. July 14, 2006); *see also Dresdner Bank AG v. M/V Olympia Voyager*, 446 F.3d 1377, 1381 (11th Cir. 2006). As outlined in the Second Restatement of Conflict of Laws, the following factors help guide courts in making that determination: (a) the place of contracting; (b) the place of negotiation; (c) the place of performance; (d) the locus of the subject matter of the contract; and (e) the domicile of the parties. Restatement (Second) of Conflict of Laws § 188 (Am. L. Inst. 1988).

Here, the Policy was negotiated and entered into in the District of Columbia. Plaintiff's principal place of business and primary residence were in the District of Columbia at the time he accepted the Policy. (*See* D.I. 87 at 13-14) (citing *id.* Ex. 2 at 10) Although some of MAIC's performance occurred in Florida – as the insurance coverage applied to Plaintiff's boating

---

[3] Plaintiff argues in a footnote that, even if the Court concludes Florida law does not govern, it should apply the "public policy exception" (D.I. 95 at 14 n.14), a "narrow exception" to the *lex loci contractus* rule, *Roach*, 945 So. 2d at 1164. The Court disagrees. The exception requires both a Florida citizen in need of protection and a paramount Florida public policy. *See id.* at 1165. In the context of insurance contracts, the insurer must also be on reasonable notice that the insured is a Florida citizen. *See id.* Plaintiff's argument fails for at least the reason that he cannot satisfy these citizenship-related requirements. He has admitted he is "not a Florida resident" and that his primary residence and principal place of business are in the District of Columbia. (*See* D.I. 87 at 13-14) (citing *id.* Ex. 2 at 10) The address and telephone number listed on his initial application suggest the same.

activities there – MAIC's performance largely took place in Delaware, where it investigated the damage to the Vessel. Further, the Vessel is currently in Delaware. Consideration of these factors suggests that either the District of Columbia or Delaware has the most significant relationship with the transaction at issue. The fact that the Vessel was kept in Florida for seven months of the year (*see* Tr. at 22) or that Stokes was in Florida when he negotiated and received the Endorsed Policy does not alter this conclusion. As Judge Altonaga stated, the "center of the alleged [claims], related parties, and the community with the most interest in the matter is ***not*** the Southern District of Florida." (D.I. 87 at Ex. 2 at 11) (emphasis added)[4]

### 2. Plaintiff's Tort Claims

The parties agree that state law, rather than federal admiralty law, governs Plaintiff's tort claims for negligent misrepresentation, fraudulent inducement, and fraud.

MAIC maintains that three jurisdictions have legitimate interests in this litigation: the District of Columbia (where the Policy was executed and where Plaintiff resided at the time he applied for the Policy), Maryland (where Plaintiff's insurance agent is located and where the Vessel was moored), and Delaware (where the Vessel sank). (D.I. 87 at 14-15) MAIC contends that there is a true conflict among these states as to whether Plaintiff may plead his tort claims concurrently with his breach of contract claim.[5] (*Id.* at 16-17)

---

[4] As with the proposition cited earlier in this opinion, the Court is not bound by Judge Altonaga's holding. But it is persuaded by, and agrees with, it.

[5] In Delaware and the District of Columbia, a tort claim may be sustained concurrently with a contract claim only if it is based on conduct distinct from the conduct underlying the breach of contract claim – for example, fraudulent inducement. *See, e.g., ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015); *Ludwig & Robinson, PLLC v. BiotechPharma, LLC*, 186 A.3d 105, 109-10 (D.C. 2018). In Maryland, by contrast, a tort claim may be maintained concurrently with a claim for breach of contract if the plaintiff can prove malice. *See, e.g., Gen. Motors Corp. v. Piskor*, 381 A.2d 16,

Plaintiff argues that Florida has a legitimate interest in the litigation and adds that other true conflicts exist among the three states with regard to attorneys' fees and costs and bad faith. (D.I. 95 at 15)

The Court agrees with the parties that at least one true conflict exists. Therefore, it must engage in a choice-of-law analysis. Moreover, as already explained, Florida's choice-of-law rules apply.

To determine the substantive law governing tort claims, Florida applies the "significant relationships test" outlined in the Second Restatement of Conflict of Laws. *See Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). The following factors help guide courts in determining which state has the most significant relationship to the occurrence and the parties: (a) the place where the injury occurred; (b) the place where the conduct allegedly causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship between the parties is centered. Restatement (Second) of Conflict of Laws § 145 (Am. L. Inst. 1988).

Here, MAIC made representations regarding the purchase of the Policy to Stokes in the District of Columbia, where the contract was created. Thus, the injury from the alleged misrepresentations occurred in the District of Columbia. While the facts that the Vessel sank in Delaware and that Plaintiff can no longer use it in Florida are "injuries" in a sense (*see* D.I. 95 at 17 & n.15), the injury alleged by Plaintiff's tort claims stems from MAIC's purported misrepresentations, which allegedly occurred in the District of Columbia. Further, Plaintiff's principal place of business and primary residence (to which the Policy and subsequent renewals

---

21-22 (Md. 1977); *Nat'l Micrographics Sys., Inc. v. OCE-Indus., Inc.*, 465 A.2d 862, 871 (Md. Ct. Spec. App. 1983).

were delivered) were in the District of Columbia at the time he accepted the Policy. As already noted, the fact that Plaintiff was in Florida when he negotiated and received the Endorsed Policy does not alter the analysis. Finally, the contractual relationship between the parties was centered in the District of Columbia. That the Vessel was built and registered in Florida and the insurance coverage applied to Plaintiff's boating activities in Florida do not outweigh the fact that the parties negotiated and entered into the contract in the District of Columbia, where the Policy was subsequently delivered.

Accordingly, the Court concludes that the District of Columbia has the most significant relationship to the occurrence and the parties, so its substantive law governs Plaintiff's tort claims.

### 3. Plaintiff's Claims Arising Under Florida Law

MAIC argues that Florida has no legitimate interest in this litigation and that Florida law should not govern any of Plaintiff's claims. (*See* D.I. 87 at 19-20) The Court agrees. As already explained, the Court concludes that Florida substantive law does not govern Plaintiff's claims. Accordingly, and as the Court will explain in addressing Defendant's motion for summary judgment, Plaintiff cannot sustain its claims arising under Florida law.

### 4. Plaintiff's Procedural Arguments

Plaintiff argues MAIC waived any objection to the application of Florida law by failing to raise its choice-of-law challenges in its motion to dismiss for improper venue. (D.I. 95 at 19-20) (citing D.I. 19) MAIC responds that, in its renewed motion to dismiss, it clearly stated that "Florida law does not apply to the terms and conditions of the . . . Policy pursuant to Florida's *lex loci contractus* doctrine." (D.I. 100 at 9) (citing D.I. 31 at 12) Further, Plaintiff has been well aware of the choice-of-law provision in the Policy since it was issued (and renewed

annually).  (*Id.*)  The Court concludes that MAIC did not waive its right to object to the application of Florida law.  It initially raised its objection in its renewed motion to dismiss, and then again via its choice-of-law motion, which was submitted well before the summary judgment stage.  Plaintiff has had ample opportunity to respond to MAIC's challenges, including by filing a response brief and being heard during the January 6, 2022 hearing.

Finally, Plaintiff notes that MAIC failed to comply with Delaware Local Rule 7.1.1, which requires nondispositive motions (such as Defendant's choice-of-law motion) to be accompanied by a statement by counsel for the moving party that the parties met and conferred on the issues raised in the motion.  (D.I. 95 at 20)  MAIC admits the parties did not meet and confer, but insists that any attempt to reach agreement would have been futile; it also observes that Plaintiff was already on notice of MAIC's position regarding choice of law.  (*See* D.I. 100 at 9)  MAIC's speculation as to the futility of meeting and conferring (though undoubtedly correct) does not excuse its failure to comply with Local Rule 7.1.1, and the Court does not condone MAIC's failure.  (*See* Tr. at 12)  Under the circumstances, however, deeming MAIC to have lost the opportunity to ask the Court to apply the correct law to the issues in this case would be a disproportionate response.  The Court believes the appropriate exercise of its discretion at this point in this case is to consider the choice-of-law motion and briefing – as it has – which has been helpful to the Court in undertaking the necessary task of determining the law applicable to the issues presented in the dispositive motions.

**B.    Plaintiff's *Daubert* Motion[6]**

Plaintiff requests that the Court strike the reports of Defendant's experts, Robert K.

Taylor and Matthew Schmahl, and preclude them from testifying at trial to the opinions stated in

those reports.  Alternatively, Plaintiff seeks to limit the testimony in those reports to certain

topics.  The Court will deny Plaintiff's motion.[7]

---

[6] MAIC asks the Court to take notice that Plaintiff failed to comply with the Court's Scheduling
Order (D.I. 69) expert deadlines on two occasions.  (D.I. 102 at 1-2, 12 n.3)  First, Plaintiff filed
a supplemental disclosure of its rebuttal expert, Mr. Hains, on May 17, 2021, two days past the
deadline.  Plaintiff points out, however, that the deadline fell on a Saturday and, so, "rolled" to
Monday, May 17.  (D.I. 103 at 3 n.8)

Second, Plaintiff served a written report by Mr. Hains on June 15, thirty days after the
deadline for rebuttal experts.  (D.I. 102 at 2)  Plaintiff responds that this was a timely filed
"reply" report, contending it was Defendant who strayed from the schedule and caused confusion
by filing its expert disclosures simultaneously with Plaintiff on March 15.  (D.I. 103 at 3-4)
MAIC seems to be asking the Court to strike Mr. Hains' report, arguing Plaintiff "willfully
disregarded" the Scheduling Order, adding that it is unfairly prejudiced because it never had a
chance to depose Mr. Hains.  (*See* D.I. 115 at 7-8)

The Court will deny this request.  There is no evidence that Plaintiff willfully disregarded
the Scheduling Order.  Further, MAIC had the opportunity to raise its discovery disputes and
timely object to Mr. Hains' testimony, yet it waited until the dispositive motions stage to bring
its concerns to the Court.  (*See* D.I. 102 at 12 n.3)

For its part, Defendant faults Plaintiff for filing its *Daubert* motion and opening brief in
an untimely manner, specifically 22 minutes and 25 minutes past the deadline, respectively.  (*See
id.* at 7 n.1)  Plaintiff responds that it had difficulty uploading the documents because the file size
of Mr. Schmahl's report was originally over the file size limit, until Plaintiff compressed it.  (*See*
D.I. 103 at 1 n.1)  The Court questions the wisdom of bring such a complaint to the Court's
attention.

As should be clear from other portions of this opinion (*see, e.g., supra* n.1 (Defendant's
filing of statement of facts) & Part III.A.4 (Defendant's failure to meet and confer)), neither
party has been perfect in complying with its procedural obligations.  While unfortunate, these
deviations from proper procedures do not come close to justifying the relief each party seeks as a
consequence.

[7] Plaintiff contends that Eleventh Circuit law should apply, since the case was transferred from
the Southern District of Florida.  (*See* Tr. at 43)  The Court agrees, instead, with Defendant and

### 1. Robert K. Taylor

Plaintiff does not appear to challenge the qualifications of Mr. Taylor, Defendant's

engineer and naval architect expert. (*See* D.I. 103 at 6) (Plaintiff describing Defendant's

arguments defending Taylor's qualifications as "misplaced") To the extent Plaintiff is making

any such challenge, the Court agrees with Defendant that Taylor is qualified. (*See* D.I. 102 at 3)

(citing Taylor's 48 years of experience as naval architect and mechanical engineer)

Plaintiff's motion principally concerns the reliability of the tests used by Taylor to

support his opinions, conclusions, and testimony. (*See* D.I. 103 at 6) Taylor conducted a "float

test" (placing the Vessel back onto the water to see if it floats) to determine the waterline of the

boat, and a "leak test" (spraying water directly into the deck hatch) to determine whether the

hatch was weathertight or watertight. (D.I. 99 Ex. A; *see* D.I. 99 at 5) Plaintiff's rebuttal expert,

Drew Hains, testified that neither of these tests was conducted in accordance with industry

standards and both, therefore, do not provide reliable support for Taylor's conclusions. (D.I. 99

Ex. C at 2-4) Among the challenged conclusions are Taylor's opinions that the Vessel's

drainage system was not compliant with industry criteria, that the deck hatch was neither

watertight nor weathertight, and that these design defects were the proximate cause of the

Vessel's sinking. (*See* D.I. 99 at 14-18)

"As long as an expert's scientific testimony rests upon good grounds, based on what is

known, it should be tested by the adversary process." *United States v. Mitchell*, 365 F.3d 215,

244 (3d Cir. 2004) (internal quotation marks omitted). "[A]n expert opinion must be based on

---

will apply Third Circuit law, as issues regarding the admissibility of evidence are procedural.
(*See id.* at 45; D.I. 102 at 7 n.2) In any event, Plaintiff concedes that Third Circuit law is
"unlikely to stray from any other circuit or district's interpretation of *Daubert* or the associated
Federal Rules" (D.I. 103 at 5), including that of the Eleventh Circuit (*see* Tr. at 43).

reliable methodology and must reliably flow from that methodology and the facts at issue – but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999).

Taylor's methodology and opinions meet these standards, notwithstanding Plaintiff's criticisms. As Defendant explains, Taylor personally inspected the boat, both in and out of the water. (D.I. 102 at 15)  He "took measurements, photographs, and performed both a float test and spray tests." (*Id.*)  Using the resulting data, he calculated the boat's displacement weight and waterline. (*Id.*)  After serving a report, he sat for a nearly five-hour deposition, explaining his testing process (*see id.* at 3; Tr. at 44), providing Plaintiff information it could have used to try to replicate his testing.

Plaintiff's allegations, based almost entirely on its own expert's opinion, that Taylor employed improper methodology, do not persuade the Court that Taylor's testimony should be stricken. (*See* D.I. 102 at 11) (noting Plaintiff failed to provide authority establishing that non-reliability can be established by opposing expert's counter opinion)  Plaintiff's attacks on Taylor go to the weight his opinions may (or may not) be given by the factfinder; they do not provide a meritorious basis to prevent the opinions from being admitted.  Taylor will be subject to cross-examination and Plaintiff will be permitted to present its competing evidence, including its own expert witness. (*See generally* Tr. at 44)

For all of these reasons, the Court will deny Plaintiff's motion.

### 2.  Matthew Schmahl

As to Mr. Schmahl, Defendant's marine surveying expert, Plaintiff primarily takes issue with the portions of his report that appear to address causation. (*See* D.I. 103 at 9; Tr. at 42-43) In Plaintiff's view, these opinions fall outside of Schmahl's expertise as a marine surveyor, are

duplicative of Taylor's opinions, address irrelevant issues, and are worded in a confusing manner. (*See* D.I. 99 at 19)  The Court disagrees.

Schmahl has nearly 40 years of experience in marine surveying, particularly in "scope of damage surveys, cost of repair appraisal pricing, [and] cause of loss evaluations" on boats. (D.I. 102 at 16; *see also* Tr. at 50)  In this case, Schmahl opines as to whether damage to the many individual component parts of the Vessel was caused by submersion or not. (*See* Tr. at 46-47)  His opinions are relevant to the issue of damages and not duplicative of Taylor's more general causation opinions.  Nor is the Court persuaded that the language Schmahl uses will be confusing to the factfinder. (*See id.* at 47)

Plaintiff further argues that Schmahl's report does not provide the basis for the component prices scoped by him. (*See* D.I. 99 at 11)  MAIC, however, points to an excerpt from the first page of the report, explaining the labor rate and material pricing utilized. (D.I. 102 at 16)

In short, Plaintiff's criticisms go to the weight and not admissibility of Schmahl's opinions.  Schmahl's testimony will aid the jury in understanding prevailing market rates for materials and labor, information which is not within the ordinary understanding of a juror. (*See id.* at 17)  Plaintiff's motion is denied.

### C.   Defendant's Summary Judgment Motion

Defendant moves for summary judgment on all of Plaintiff's claims, advancing several theories in support.  The Court will grant in part and deny in part Defendant's motion.

### 1. Breach of Contract

Defendant argues that, as a matter of law, it did not breach the Policy because (1) the loss was not fortuitous or accidental, (2) a design defect was the efficient proximate cause of the loss, and (3) the Vessel was unseaworthy, in violation of the Policy's express warranty of seaworthiness, rendering the Policy void.

As to the first argument, the Policy includes a sudden accidental damage clause, which states: "We will cover sudden accidental direct physical loss or damage to the insured watercraft." (D.I. 87 Ex. 4 at 43)  The Policy does not define "accidental," but the parties appear to agree it is synonymous with "fortuitous." (*See* Tr. at 6)  To determine who bears the initial burden on this issue, the Court must first decide whether to apply federal admiralty law or D.C. law, which turns on whether there are established principles or precedents of federal admiralty law governing fortuity.

As the fortuity rule is a well-established principle of federal admiralty law, the Court agrees with Defendant that federal admiralty law governs this issue. *See Chartis Prop. Cas. Co. v. Inganamort*, 2019 WL 1277518, at *2-3 (D.N.J. Mar. 20, 2019), *aff'd*, 953 F.3d 231 (3d Cir. 2020).  "Federal courts sitting in admiralty have been applying some variation of the fortuity rule in marine insurance cases for over a hundred years." *Youell v. Exxon Corp.*, 48 F.3d 105, 110 (2d Cir.), *cert. granted, judgment vacated on other grounds*, 516 U.S. 801 (1995).  Under the fortuity rule, "all-risk policies in marine insurance contracts only cover losses caused by fortuitous events."[8] *Id.*  The insured bears the burden of showing a fortuitous loss, although this

---

[8] The parties do not dispute that the Policy is an "all-risk" insurance contract. (*See, e.g.*, D.I. 114 at 9)  "[A] typical 'all-risk' policy, by its terms, states that it covers any kind of loss from any external cause as long as it is not specifically excluded." *Doherty v. Allstate Indem. Co.*, 2017 WL 1283942, at *14 (E.D. Pa. Apr. 6, 2017), *aff'd*, 734 F. App'x 817 (3d Cir. 2018).

burden is "not a particularly onerous one." *Great Lakes Ins. SE v. Wave Cruiser LLC*, 499 F. Supp. 3d 1191, 1198 (S.D. Fla. 2020).

A loss is fortuitous when it was "unforeseen, unexpected, unintended, unavoidable, or caused by the insured's own negligence." *Id.* at 1197. By contrast, a loss is not fortuitous if it results from "intentional misconduct of the insured, [an] inherent defect in the object damaged, fraud, [or] normal wear and tear." *Id.* at 1198.

Courts have considered "heavy rainfall" to be a "fortuitous event for purposes of recovery under an all-risk policy." *Chartis*, 2019 WL 1277518, at *3. Plaintiff contends that extreme rains and weather from Hurricane Michael caused the Vessel to sink, and that the evidence Plaintiff has submitted satisfies his initial burden to show the loss was fortuitous.

For example, Plaintiff points to statements made by Defendant's post-loss inspector, Jonathan Klopman, who confirmed that a "thunderstorm passed through the marina between 11:00 PM and midnight," and "[t]he total rainfall for this time period was 7.29 inches." (D.I. 108 Ex. E at 4) By Klopman's account, "[t]his is an extreme amount of rainfall by any measure." (*Id.*) When asked whether a rainfall of seven inches in the span of an hour or two is a normal amount of rain, Defendant's claims adjuster, Justin Evenson, responded, "[n]o, I would not say that's a normal amount of rain," adding "[t]hat's an excessive amount of rain." (D.I. 108 Ex. D at 51) Plaintiff also points to local weather station rain collection datasets that, in Plaintiff's view, show an "extreme" amount of rainfall in a short period of time. (D.I. 108 Ex. G) Finally, Plaintiff's expert, Charles Stephens, opines that "the [V]essel's sinking was caused by an excessive amount of rain from Hurricane Michael." (D.I. 114 Ex. A at 1) Stephens came to that conclusion after inspecting the Vessel and location of the loss multiple times and reviewing meteorological information, among other data. (*See id.*)

20

Defendant counters that Plaintiff fails to connect most of the evidence on which he relies to the Vessel's submersion. (D.I. 115 at 3-4)  It points out that none of its own experts, representatives, or claims adjusters have opined that the rainfall was so extreme that it *caused* the Vessel's submersion.  In fact, Mr. Klopman testified: "if you have one boat that . . . mysteriously sinks . . . and no one else sank, usually it's not an act of God." (D.I. 105 Ex. 11 at 128-29) Defendant also argues that the opinion of Stephens – that the rainfall caused the Vessel to sink – is "an impermissible legal conclusion." (D.I. 105 at 7)

In Defendant's view, design defects were the proximate cause of the loss, eliminating coverage. *See Great Lakes*, 499 F. Supp. 3d at 1198.  Defendant points to testimony from its expert, Taylor, who opines that the Vessel had a number of design defects, leaving it "not capable of staying afloat in heavy rain, as would be reasonably expected." (D.I. 105 Ex. 8 at 18) Taylor observes that the Vessel was not built in compliance with guidelines established by the American Boat and Yacht Council or International Organization for Standardization and that its manufacturer was not certified by the National Marine Manufacturers Association. (*Id.* Ex. 9 at 17-21)  Taylor concludes that the Vessel would not have sunk had it been designed and built to minimum industry performance requirements for cockpit drainage. (*Id.* Ex. 8 at 13-14, 16-17) Klopman echoes this opinion, concluding that "[t]he loss was the direct result of improper design and construction." (*Id.* Ex. 3 at 10)

Under federal maritime law, the standard for determining causation is efficient proximate cause.  That is, "'the proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result.'" *N.H. Ins. Co. v. Krilich*, 387 F. App'x 940, 942 (11th Cir. 2010) (quoting *Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co.*, 302 U.S. 556, 562 (1938)).  Courts consider the "predominant or determining cause," and where two causes

21

appear to exist, courts consider the cause that rendered the loss "inevitable." *Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F. Supp. 1046, 1061-62 (S.D.N.Y. 1997), *aff'd*, 134 F.3d 103 (2d Cir. 1998).

Here, the record demonstrates a genuine dispute of material fact as to the efficient proximate cause of the Vessel's sinking. While the record contains ample evidence of "extreme" rainfall, it does not conclusively establish that such rainfall rendered the loss "inevitable." Both sides have presented evidence sufficient to persuade a reasonable factfinder of the correctness of their view of the cause for the Vessel's sinking. Whether the loss is covered by the Policy turns on which side is found to be correct as to the cause of the loss. Accordingly, summary judgment for Defendant is not warranted.

As a separate argument for summary judgment, MAIC argues that the Vessel was unseaworthy at the inception of the Policy – in violation of the Policy's express warranty of seaworthiness – making the Policy void. Under federal admiralty law, where an insured breaches an express warranty of seaworthiness, the entire contract is void *ab initio*. *See State Nat'l Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1366 (S.D. Fla. 2011). Where a vessel sinks while moored in calm waters, or where the vessel's equipment breaks under normal use, there is a rebuttable presumption of unseaworthiness. *See, e.g.*, *In re Sea Star Line, LLC*, 2016 U.S. Dist. LEXIS 178293, at *30 (M.D. Fla. Sept. 23, 2016). Given the evidence that Hurricane Michael inflicted unusually heavy rains and winds on the Vessel, MAIC is not entitled to a presumption of unseaworthiness.

The insurer bears the burden of establishing that a vessel was unseaworthy at the moment the policy attached. *See Axis Reinsurance Co. v. Resmondo*, 2009 U.S. Dist. LEXIS 122778, at *16 (M.D. Fla. May 8, 2009). Here, the record demonstrates a genuine dispute of material fact

as to whether the Vessel was seaworthy at the inception of the Policy.  Again, summary judgment is not warranted.

Defendant also seeks summary judgment that it did not breach any duty to "adjust" Plaintiff's claim.  (*See* D.I. 105 at 17)  Citing Black's Law Dictionary, MAIC contends that "[t]o 'adjust' means 'to determine the amount that an insurer will pay an insured to cover a loss,'" insisting it "has engaged in activities" that meet this definition.  (*Id.*)  MAIC, however, does not describe which "activities" it engaged in that could be considered "adjusting," and does not respond to Plaintiff's complaint that it failed to "issue a coverage determination for 1,043 days." (D.I. 114 at 18)  There is, again, a genuine dispute of material fact, which precludes a grant of summary judgment.

It follows from the Court's conclusion as to Plaintiff's breach of contract claim that the Court must also deny MAIC's summary judgment motion directed to Plaintiff's request for declaratory relief (Count II).  The two counts are closely related, and Defendant has not provided any separate briefing or argument specific to the declaratory relief claim.

### 2. Tort Claims

MAIC seeks summary judgment on Plaintiff's tort claims.

The Court has already found that D.C. law governs the tort claims.  Under D.C. law, tort claims may be sustained concurrently with a breach of contract claim only if they are based on conduct distinct from the conduct underlying the breach of contract claim.  *See e.g., Ludwig*, 186 A.3d at 109-10.  Plaintiff's negligent misrepresentation and fraud claims do not satisfy this requirement.  These claims stem from MAIC's "duty to make truthful representations in all aspects of coverage" and are directly connected to MAIC's alleged denial of coverage that forms a basis for the breach of contract claim.  (*See, e.g.,* D.I. 1-1 ¶¶ 73-80, 91-97)  As pled, the duties

23

MAIC owed to Plaintiff flowed from the parties' contractual relationship and were not independent of the contract.

By contrast, the fraudulent inducement claim (Count V), based on conduct leading up to the procurement of the contract, is independent of the breach of contract claim. *See Ludwig*, 186 A.3d at 111. D.C. law, therefore, does not bar Plaintiff from bringing this claim concurrently with his breach of contract claim.

Accordingly, the Court will dismiss Plaintiff's negligent misrepresentation (Count IV) and fraud (Count VII) claims, as he cannot sustain them under D.C. law.

### 3. Claims Lying in Fraud or Estoppel

Defendant contends that Plaintiff has failed to present sufficient evidence to sustain a verdict in Plaintiff's favor on three tort claims which lie in fraud and on his estoppel claim. MAIC contends that the record contains no evidence that MAIC engaged in material misrepresentations or omissions, or that Plaintiff relied on such misrepresentations or omissions. (D.I. 105 at 18) Because, as explained above, the Court is dismissing Plaintiff's negligent misrepresentation and fraud claims, the Court considers MAIC's argument only as to Counts V (fraudulent inducement) and VI (estoppel).

Plaintiff's position is that MAIC represented that fortuitous losses would be covered under the Policy, Plaintiff relied on this position to his detriment, and MAIC later changed this position by "positing that Plaintiff's policy is ineffectual." (D.I. 114 at 19) These arguments reveal that Plaintiff's claims are just different manifestations of the parties' disputes as to whether the loss is fortuitous, whether any policy exception applies, and whether the loss is covered under the Policy. The Court agrees with Defendant that Plaintiff has failed to produce sufficient evidence from which a reasonable factfinder could find for Plaintiff on the fraudulent

inducement or estoppel claims. (*See* D.I. 105 at 19-20) He cannot prove, for example, that MAIC made a material misrepresentation or omission. Thus, the Court will grant MAIC's motion for summary judgment as to these claims.

### 4. Claims Arising Under Florida Law

The Court agrees with MAIC that Plaintiff's claims under Florida law (Counts III & VIII) should be dismissed, as Florida law does not govern. (*See* D.I. 105 at 20) Additionally, as Plaintiff has agreed, Count VIII – relating to mediation – is moot because the parties have already mediated. (*See* Tr. at 68)

In light of the Court's conclusion that Florida law does not govern Plaintiff's claims, Plaintiff will be permitted leave to amend to add analogous claims under D.C. law, if it wishes and if it believes it has a good faith basis to do so (taking account of the Court's rulings). (*See* D.I. 114 at 20 n.23) In providing Plaintiff this opportunity, the Court has considered Defendant's failure to meet and confer before filing its choice-of-law motion, which deprived Plaintiff of the opportunity at that time to consider dropping its Florida law claims and trying to add D.C. law claims. (*See* Tr. at 28-29) The Court finds that the best exercise of its discretion under the circumstances is to permit Plaintiff limited leave to amend.

### D.    Plaintiff's Summary Judgment Motion

Plaintiff seeks summary judgment that MAIC breached the Policy for failing to pay for a fortuitous loss that undisputedly occurred during the time the Policy was in effect. (*See* D.I. 108 at 9-12) The Court has already determined that there is a genuine dispute of material fact as to the cause of the Vessel's sinking. Determining the proximate cause of the loss – whether it was extreme rain or a design defect – is necessary to decide whether the loss was fortuitous. Thus, for essentially the same reasons the Court gave in denying Defendant's largely mirror-image

motion for summary judgment, the Court also denies Plaintiff's motion for summary judgment that MAIC breached the Policy.

Next, Plaintiff argues Defendant cannot meet its burden to establish that Plaintiff's damages are excluded (an issue that will only become ripe if Plaintiff first meets its burden to show a fortuitous loss). Plaintiff asserts that, because the Policy does not include "anti-concurrent cause" language, Defendant cannot rely on any exclusions. (*Id.* at 13) In this context, according to Plaintiff, the "concurrent causation" doctrine applies, which provides that "when there are two . . . or more causes of loss, the policyholder's claim is covered as long as the immediate or proximate cause of loss is covered by the policy." *Colella v. State Farm Fire & Cas. Co.*, 407 F. App'x 616, 622 (3d Cir. 2011).

Defendant correctly notes, however, that Plaintiff relies solely on cases not involving maritime insurance policies or admiralty law. (*See* D.I. 112 at 7) As MAIC argues, in ***maritime*** cases, the "efficient proximate cause" standard applies regardless of whether the insurance policy includes "anti-concurrent cause" language. (*See id.* at 5-7) (citing *St. Paul Fire & Marine Ins. Co. v. Lago Canyon*, 2008 U.S. Dist. LEXIS 142202, at *17-19 (S.D. Fla. Mar. 6, 2008) (determining that doctrine of efficient proximate cause "is the appropriate standard to be applied to determine whether a loss is covered under a marine insurance policy")) To obtain the damages it seeks, then, Plaintiff will have to prove its theory that extreme rain was the efficient proximate cause of the loss; that is, it will not be sufficient if Plaintiff proves only that a fortuitous event ***and*** an excluded event caused its loss. Accordingly, this portion of Plaintiff's motion will be denied.

Plaintiff also seeks summary judgment on MAIC's twelve affirmative defenses. (*See* D.I. 116 at 7) Plaintiff faults the affirmative defenses for being "conclusory" – and then devotes no

26

more than one or two sentences to each defense. (D.I. 108 at 14-15)  Plaintiff provides no meaningful legal analysis or discussion of the factual record (which the Court must take in the light most favorable to Defendant).  Accordingly, this portion of Plaintiff's motion will be denied.

Finally, Plaintiff argues that MAIC's post-loss payments and actions are admissions that the loss is covered under the Policy. (*Id.* at 16-17)  In Plaintiff's view, MAIC treated the loss as "salvage ownership" of the Vessel. (*Id.* at 17)  It contends that MAIC retained care, custody, and control of the Vessel after it sank; ordered that it be raised, salvaged, and transported to a different marina (of MAIC's choosing); and authorized work to be done on the Vessel. (*Id.* at 16-17)  Plaintiff contends that MAIC's payments for wreck removal, storage, and other expenses occurring as a result of the loss are an admission of coverage. (*Id.* at 17)  For these reasons, in Plaintiff's view, the Court should at least grant summary judgment as to coverage, even if the amount of damages remains in dispute. (*Id.* at 19)

In seeking this relief, Plaintiff relies on the Policy's "Protect and Recover" clause, which states: "[i]n the event of a covered loss to the insured watercraft, you (Stokes) must protect the insured watercraft from further loss and make every effort to recover it. We (MAIC) will pay the reasonable costs you incur under this condition." (D.I. 108 Ex. B at 8)  Plaintiff contends that, "[u]nder the plain and unambiguous language of the [P]olicy, the need to 'protect' the damaged Vessel only arises 'in the event of a covered loss.'" (D.I. 108 at 16)

The Court will deny this portion of Plaintiff's motion. As Defendant correctly notes, the language Stokes relies on in the "Protect and Recover" clause refers to ***Stokes***' post-loss duties; it does not impose on ***MAIC*** a need to protect a damaged Vessel that arises ***only*** in the event of a

27

covered loss. (D.I. 112 at 17; *see also* Tr. at 55 (Plaintiff conceding that "you" in first sentence of clause refers to insured))

Nor is the Court persuaded by Plaintiff's contention that the cases it cites (*see* D.I. 108 at 18-19) stand for the broad notion that "admission of coverage occurs when an insurer pays for necessary repairs for damages." (Tr. at 80)  Instead, as MAIC contends, the cases on which Plaintiff relies can be distinguished on numerous grounds, including that in the instant case MAIC has denied liability and has not paid anything directly to Stokes. (*See* D.I. 112 at 17-18; *see also* Tr. at 87)

MAIC has never admitted the loss is covered. (D.I. 112 at 15)  To the contrary, its Rule 30(b)(6) witness, Katherine Christodoulatos, explained that it is "not unusual while the claim is still being investigated that [MAIC] may cover sue and labor, storage expenses while the claim is being investigated and again, that is without prejudice." (D.I. 108 Ex. A at 104-05)  MAIC also points to its November 12, 2018 reservation of rights letter, in which it reserved the right to investigate and handle Plaintiff's claim without prejudice.[9] (*See* D.I. 112 at 16)  Relatedly, a "Defense" clause in the Policy reflects an understanding that MAIC "may investigate and settle any claim or suit at [its] discretion." (D.I. 108 Ex. B at 10; *see also* Tr. at 75-76)  Finally, MAIC denies that it took "salvage ownership," noting that the title of the Vessel remains with Plaintiff. (D.I. 112 at 17)

While MAIC could have taken steps to convey more clearly its position as to coverage – for example, issuing a reservation of rights *before* making any payments or billing Stokes as it made payments (*see* Tr. at 58, 61) – its failure to do so does not conclusively establish liability.

---

[9] Plaintiff notes that MAIC issued this letter *after* making payments; however, the letter applies to any actions taken "before or after the date of th[e] Letter." (*See* D.I. 108 at 17; D.I. 112 at 16)

Plaintiff has not met its burden to demonstrate that there is no genuine dispute of material fact as to whether MAIC's payments and conduct are an admission of coverage. Accordingly, the Court will deny Plaintiff's motion for summary judgment.

**IV.   CONCLUSION**

For the reasons explained above, the Court will deny Plaintiff's *Daubert* motion. The Court will deny MAIC's motion for summary judgment as to Plaintiff's breach of contract claim and request for declaratory relief, and will grant the portions of this motion as to Plaintiff's tort claims, estoppel claim, and its remaining claim arising under Florida law. As Plaintiff is no longer petitioning for mediation, the Court will deny as moot MAIC's motion for summary judgment as to that request. Plaintiff will be provided a limited opportunity to amend to try to add claims arising under the applicable D.C. law. Finally, the Court will deny Plaintiff's summary judgment motion. An appropriate order follows.

29